**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

TAMIKA R. MONTGOMERY-REEVES
VICE CHANCELLOR

Leonard Williams Justice Center
500 N. King Street, Suite 11400
Wilmington, Delaware 19801-3734

Date Submitted: July 12, 2018
Date Decided: October 31, 2018

M. Duncan Grant, Esquire
Christopher B. Chuff, Esquire
Pepper Hamilton LLP
1313 N. Market Street, Suite 5100
Wilmington, DE 19801

Eric Lopez Schnabel, Esquire
Robert W. Mallard, Esquire
Alessandra Glorioso, Esquire
Dorsey & Whitney LLP
300 Delaware Avenue, Suite 1010
Wilmington, Delaware 19801

RE: ***Diane C. Creel v. Ecolab, Inc.***
Civil Action No. 12917-VCMR

Dear Counsel:

This letter opinion addresses both Defendant's Motion to Dismiss Count I of Plaintiff's Complaint and Plaintiff's Motion for Summary Judgment. For the reasons stated below, I deny the Motion to Dismiss, and I grant in part and deny in part the Motion for Summary Judgment.

## I. BACKGROUND

For purposes of the Motion to Dismiss, the facts are drawn from Plaintiff's Verified Amended and Supplemental Complaint for Indemnification (the

"Complaint") and the documents incorporated by reference therein.[1]  For purposes of the Motion for Summary Judgment, the facts are drawn from the pleadings and the evidence submitted by the parties.[2]

## A.     Ecovation Before the Merger

This action arises from Plaintiff's request for indemnification from Ecolab, Inc. ("Ecolab"), a Delaware corporation in the business of providing water, hygiene, and energy technologies.[3]  The corporation at the center of this dispute is Ecovation, Inc. ("Ecovation" or the "Company"), a Delaware corporation that was in the business of providing sustainable wastewater treatment and renewable energy solutions.[4]  In 2008, Ecolab acquired Ecovation through a merger.[5]  Diane C. Creel

---

[1]     On a motion to dismiss under Rule 12(b)(6), the Court may consider a document outside the pleadings if "the document is integral to a plaintiff's claim and incorporated into the complaint" or "the document is not being relied upon to prove the truth of its contents."  *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996) (citing *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69-70 (Del. 1995)); *see Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 96 n.2 (Del. 2013).

[2]     *See* Ct. Ch. R. 56(c).

[3]     Compl. ¶ 7.

[4]     *Id.* Ex. B ¶ 19.

[5]     *See id.* Ex. C.

was the President, Chief Executive Officer, and Chair of the Board of Directors of Ecovation from May 2003 until the 2008 merger.[6]

When Creel joined Ecovation, it was struggling financially.[7] In June 2004, W. Jerome Frautschi, as trustee of the W. Jerome Frautschi Living Trusts and agent of the Pleasant T. Rowland Revocable Trusts (together, the "Trusts"),[8] caused the Trusts to extend a $30 million line of credit to the Company; this agreement was memorialized in the Line of Credit Agreement (the "LOC").[9] After Ecovation's Board of Directors unanimously approved the LOC, Frautschi joined the Board in May 2004.[10] He served in that capacity until he resigned in November 2005.[11]

---

[6] Compl. ¶ 10. After Ecolab acquired Ecovation, Creel no longer served as a director or officer of Ecovation; she became an employee of Ecolab. *Id.*

[7] *Id.* Ex. A ¶ 25.

[8] Compl. Ex. G, at 4 (listing Frautschi as Trustee of the W. Jerome Frautschi Living Trust). The parties never explicitly define Frautschi's relationship to the Pleasant T. Rowland Revocable Trust. *See, e.g.*, Def.'s Opening Br. 8 (describing the Trusts as "owned and controlled by Mr. Frautschi and his wife"). I presume an agency relationship for purposes of this opinion. This presumption has no bearing on my analysis or decision.

[9] Compl. Ex. A ¶¶ 24-25.

[10] *Id.* ¶ 21.

[11] *Id.* ¶ 37.

The $30 million LOC proved insufficient to resolve the Company's financial problems.[12]  Therefore, Creel negotiated with the Trusts over the next three years to amend the LOC multiple times and increase the Company's financing to over $60 million.

## B.     The Underlying Proceedings

Creel's request for indemnification in this action stems from proceedings in the New York Supreme Court (the "*Ahlers* Action") and in the United States District Court for the Western District of New York (the "*ITV* Action").[13]  Both underlying actions involved allegations that Creel provided material nonpublic inside information to Frautschi and the Trusts regarding Ecolab's desire to acquire Ecovation.[14]

### 1.     The *Ahlers* Action

In the *Ahlers* Action, the plaintiffs asserted claims for breach of fiduciary duty, interested director transactions, breach of the Charter, and unjust enrichment against Creel, Frautschi, and the Trusts.[15]   The defendants prevailed on summary

---

[12]     *Id.* ¶ 45.

[13]     *Id.* ¶ 1.

[14]     *Id.* Ex. A ¶¶ 96-102; *id.* Ex. B ¶ 328.

[15]     *Id.* Ex. B ¶¶ 391-442.

judgment.[16]  The New York Appellate Division, Fourth Department, affirmed the trial court's order on June 30, 2017.[17]  The parties filed no further appeals.[18]

### 2.    The *ITV* Action

In 2008, a stockholder of Ecovation, Industrial Technology Ventures, L.P. ("ITV"), filed an action against Creel, Frautschi, and the Trusts.[19]  In that action, the plaintiff asserted claims against Creel for breach of fiduciary duty, tortious interference with business relationships, securities fraud, common law fraud, and civil conspiracy.[20]

The plaintiff alleged that while Creel and Frautschi were directors of Ecovation, they, together with the Trusts, schemed to "take advantage of the Company's precarious financial positon and looming default" under a provision of the LOC.[21]  The plaintiff further alleged that because Creel, in her capacity as Ecovation's CEO and President, ignored other sources of investment and because

---

[16]    *Id.* ¶ 92.

[17]    *Id.*

[18]    *Id.*

[19]    Compl. ¶ 22; Def.'s Opp'n Br. 1.

[20]    *Id.* ¶ 24.

[21]    *Id.* Ex. A ¶ 35.

the Trusts increased the LOC, the Trusts were in a position of significant power to threaten foreclosure on the LOC.[22] The Trusts also owned a substantial amount of stock and stock warrants in the Company.[23] Under the terms of the LOC, the Company issued warrants to the Trusts to purchase shares of Company stock for $0.01 per share.[24] Through the LOC and the terms of the Trusts' loans to the Company, the Trusts increased their ownership of Series A Preferred Stock to over fifty percent, also increasing their already substantial influence.[25] In 2007, allegedly after receiving material nonpublic information from Creel regarding Ecolab's interest in acquiring Ecovation, the Trusts purchased additional Series A Preferred stock from other investors, including the plaintiff.[26] As a consequence of Ecolab's acquisition of Ecovation, the Trusts made a substantial profit on the shares they purchased from the plaintiff.[27] The ITV complaint followed.

---

[22]  *Id.* ¶¶ 59, 61, 70.

[23]  *Id.* ¶¶ 26, 29.

[24]  *Id.* ¶ 64.

[25]  *Id.* ¶ 71.

[26]  *Id.* ¶¶ 102, 106.

[27]  *Id.* ¶ 128.

Throughout the *ITV* Action, Ecolab advanced defense fees and expenses to Creel, first through its directors' and officers' liability policy and later, when that policy was exhausted, from its own funds.[28]

### 3. Settlement of the *ITV* Action

The parties in the *ITV* Action began considering settlement in 2015.[29] They attempted mediation but were unsuccessful.[30] Nonetheless, they continued settlement negotiations.[31] Counsel for Creel and counsel for Frautschi and the Trusts estimated that a reasonable settlement of the claims would fall in the range of $3 million to $5 million.[32] They communicated this estimate in a memorandum to Ecolab's counsel in September 2015.[33]

In April 2016, the parties reached a settlement agreement in principle.[34] The total settlement amount was $4.9 million; the parties to the *ITV* Action apportioned

---

[28]    Compl. ¶ 38; *see id.* ¶¶ 42-43.

[29]    *See id.* ¶¶ 37, 41.

[30]    *Id.* ¶¶ 41, 45.

[31]    *Id.* ¶ 46.

[32]    *Id.* ¶¶ 39, 48; Glorioso Aff. Ex. 11.

[33]    Compl. ¶ 39; Glorioso Aff. Ex. 11.

[34]    Compl. ¶ 51.

$2.94 million to Creel and $1.96 million to the Frautschi and the Trusts (together, the "Frautschi Parties").[35]  As a condition to settlement, the agreement required Ecolab to fully indemnify Creel for her portion of the settlement.[36]

Counsel for Creel and counsel for the Frautschi Parties communicated the terms of this agreement to Ecolab's counsel on April 28, 2016.[37]  Nearly three months later, on July 19, 2016, Ecolab's counsel informed Creel and the Frautschi Parties, through their counsel, that Ecolab would contribute $3 million to the settlement.[38]  This contribution would be contingent on releases from Creel and the Frautschi Parties as to claims for indemnification, an unacceptable result for the Frautschi Parties.[39]  As such, the parties did not effectuate the agreement in principle, and Ecolab did not contribute any money toward settlement.[40]

The parties continued settlement discussions.  In August 2016, the parties executed a Settlement Term Sheet that largely reflected their agreement in principle

---

[35]  *Id.*

[36]  *Id.* ¶ 52.

[37]  *Id.* ¶ 57.

[38]  *Id.* ¶ 58.

[39]  *Id.*

[40]  *Id.*

from April 2016.[41]  The Settlement Term Sheet contained the same apportionment: $2.94 million to be "paid on behalf of Defendant Diane C. Creel," and $1.96 million to "be paid by" the Frautschi Defendants.[42]

Although Creel, Frautschi, and the Trusts were aware of Ecolab's position regarding its contribution, the Settlement Term Sheet contained a condition that Ecolab agree to pay or be ordered by a court to pay Ms. Creel's portion of the settlement.[43]  This contingency reduced the certainty of settlement, and the district court placed the proceeding on its trial calendar for January 2018.[44]

In October 2016, Ecolab denied Creel's demand for indemnification.[45]  The parties in the *ITV* Action therefore could not move forward with the Settlement Term Sheet.[46]  The parties agreed to modify the terms of the settlement to eliminate the indemnification contingency.[47]  To move forward with settlement of the *ITV* Action,

---

[41]     *Id.* ¶ 60; *id.* Ex. G.

[42]     *Id.* Ex G, at 1.

[43]     *Id.* at 1-2; Compl. ¶ 77; *see id.* ¶ 58.

[44]     *Id.* ¶ 78.

[45]     *Id.* ¶¶ 79-80.

[46]     *Id.* ¶ 81.

[47]     *Id.* ¶ 82.

the Trusts agreed to advance to Creel her portion of the settlement proceeds.[48] The Trusts and Creel memorialized this advancement in the written Agreement to Effectuate Settlement Agreement dated April 24, 2017 ("Effectuation Agreement").[49] Under the terms of the Effectuation Agreement, the Trusts advanced Creel's portion of the settlement, and Creel agreed to pursue indemnification from Ecolab.[50] If Creel is successful in obtaining indemnification, she must reimburse the Trusts for any amount she receives in indemnification, up to the amount the Trusts advanced.[51]

To remove the contingency of indemnification from settlement in the *ITV* Action, the plaintiff agreed to reduce the settlement amount to $4.65 million, a difference of $250,000.[52] The parties reduced the Trusts' portions of the settlement because the Trusts were assuming the risk that Creel may not be successful in her indemnification claim.[53]

---

[48]     *Id.* ¶ 83; *id.* Ex. H, at 1.

[49]     *Id.* Ex. H.

[50]     *Id.* §§ 1-2.

[51]     *Id.* § 1.

[52]     Compl. ¶ 84.

[53]     *Id.* ¶ 85.

On April 25, 2017, the parties signed a formal Settlement and Release Agreement (the "Settlement").[54] Ecolab did not explicitly approve the Settlement.[55] Under the terms of the Settlement and the Effectuation Agreement, the Trusts provided $2.94 million to Creel's counsel, who in turn transferred that amount to plaintiff's counsel.[56] The Frautschi Parties also paid their portions of the Settlement to the plaintiff.[57] The district court dismissed the *ITV* Action on May 1, 2017.[58]

## II. ANALYSIS OF ECOLAB'S MOTION TO DISMISS

In this action, Creel seeks indemnification for her portion of the Settlement in the *ITV* Action (Count I), the difference between Creel's defense counsel's standard hourly rates and the discounted rate Ecolab actually paid in the *ITV* and *Ahlers* Actions (Count II), and the fees Creel incurred to enforce her indemnification rights in this action (Count III).[59]

---

[54]    *Id.* ¶ 86; *id.* Ex. I.

[55]    *See* Compl. ¶ 80.

[56]    *Id.* ¶ 87; *id.* Ex. H § 1; *id.* Ex. I § 3(d).

[57]    Compl. ¶ 87; *id.* Ex. I § 3(a)-(c).

[58]    Compl. ¶ 88; *id.* Ex. N.

[59]    *See generally* Compl. ¶¶ 101-27.

Ecolab filed its Motion to Dismiss Count I of the Complaint on October 13, 2017,[60] and an amended motion on November 13, 2017 (the "Motion to Dismiss").[61] Ecolab argues that Creel fails to state a claim under Court of Chancery Rule 12(b)(6) because Creel did not actually incur her portion of the Settlement when the Trusts advanced that amount to her.[62]

When considering a motion to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6), a court must accept all well-pled factual allegations in the complaint as true, accept even vague allegations in the complaint as well-pled if they provide the defendant notice of the claim, "draw all reasonable inferences in favor of the non-moving party," and deny the motion unless the plaintiff could not recover "under any reasonably conceivable set of circumstances susceptible of proof."[63]

### A. Section 145 of the General Corporate Law of Delaware

This Court has long recognized the dual policies of Section 145:

> (a) [to allow] corporate officials to resist unjustified lawsuits, secure in the knowledge that, if vindicated, the

---

[60]      D.I. 58.

[61]      D.I. 67.

[62]      *See generally* Def.'s Opening Br. Mot. to Dismiss 17-30.

[63]      *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002).

> corporation will bear the expense of litigation; and (b) [to encourage] capable women and men to serve as corporate directors and officers, secure in the knowledge that the corporation will absorb the costs of defending their honesty and integrity.[64]

Additionally, "[Section 145] should be broadly interpreted to further the goals it was enacted to achieve."[65]

Section 145(a) authorizes Delaware corporations to indemnify directors, officers, employees, and agents in connection with actions brought against them by third parties:

> A corporation shall have power to indemnify any person who was or is a party . . . to any . . . action, suit or proceeding . . . (other than an action by or in the right of the corporation) by reason of the fact that the person is or was a director, officer, employee or agent of the corporation . . . against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with such action, suit or proceeding if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation . . . .[66]

---

[64] *VonFeldt v. Stifel Fin. Corp.*, 714 A.2d 79, 84 (Del. 1998).

[65] *Stifel Fin. Corp. v. Cochran*, 809 A.2d 555, 561 (Del. 2002).

[66] 8 *Del. C.* § 145(a).

Stated differently, to obtain indemnification under Section 145(a), the director, officer, employee, or agent must show that (1) she was a party to a threatened, pending, or completed action, suit, or proceeding by reason of the fact that she was a director, officer, employee, or agent of the corporation; (2) the action, suit, or proceeding was brought neither by nor in the right of the corporation; (3) she actually and reasonably incurred attorneys' fees, expenses, judgments, fines, or amounts paid in settlement in connection with the action, suit, or proceeding; and (4) she "acted in good faith and in a manner [she] reasonably believed to be in or not opposed to the best interests of the corporation."[67]

Ecovation's Amended and Restated Certificate of Incorporation (the "Charter") provides Creel with indemnification against "all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred or suffered by the indemnitee."[68] Ecovation's Bylaws (the "Bylaws") provide Creel with indemnification to the "fullest extent authorized or permitted by the Delaware

---

[67] *Id.*

[68] Compl. Ex D, at 16. Ecovation was formerly known as AnAerobics, Inc.; the Charter reflects the former name.

General Corporation Law."[69]  In its Motion to Dismiss, Ecolab challenges only that

Creel did not actually "incur" a loss or expense in the Settlement of the *ITV* Action

because the Trust paid Creel's portion of the Settlement and because she will never

pay her portion of the Settlement.[70]

### B.     Creel Has Stated a Reasonably Conceivable Claim That She Incurred the Settlement Amount

This Court has defined "incur" in the advancement context as "to become

liable and subject to" and "[t]o suffer or bring on oneself (a liability or expense)."[71]

The parties here do not dispute the definition of incur; rather, they dispute whether,

under the facts and circumstances surrounding the Settlement, Creel's portion of the

Settlement falls within this definition.

---

[69]     *Id.* Ex. E art. V, § 1, at 9.  The Bylaws reflect Ecovation's former name, AnAerobics, Inc.

[70]     *See generally* Def.'s Opening Br. Mot. to Dismiss 17-30.

[71]     *Pontone v. Milso Indus. Corp.*, 100 A.3d 1023, 1039-40 (Del. Ch. 2014) (alteration in original) (quoting *Agere Sys., Inc. v. Worthington Steel Co.*, 2013 WL 4958220, at *9 (Del. Super. Sept. 12, 2013), *aff'd*, 89 A.3d 478 (Del. 2014); *Ameristar Casinos, Inc. v. Resorts Int'l Hldgs., LLC*, 2010 WL 1875631, at *9 (Del. Ch. May 11, 2010)).

The Company points to *Levy v. HLI Operating Co.*[72] and *Pontone v. Milso Industries Corp.*[73] to argue that Creel did not incur any expense because the Trusts paid the expense as the Effectuation Agreement legally required the Trusts to do.

In *Levy*, the Court held that parties who had been fully reimbursed for certain expenses by one indemnitor lacked standing to pursue indemnification for the same expenses from a different indemnitor.[74] HLI Operating Company, Inc. ("Old Hayes") issued restatements of its financial results.[75] Thereafter, stockholders sued six former directors of Old Hayes in multiple securities lawsuits.[76] To settle certain of those lawsuits, the former directors agreed to pay $1.2 million each.[77] They then requested indemnification from Old Hayes for those payments under the indemnification provision of Old Hayes's bylaws and various indemnification

---

[72] 924 A.2d 210 (Del. Ch. 2007).

[73] 100 A.3d 1023 (Del. Ch. 2014).

[74] 924 A.2d at 224.

[75] *Id.* at 214.

[76] *Id.*

[77] *See id.*

agreements.[78]  When Old Hayes rejected the directors' request, the former directors

filed suit.[79]

During the indemnification litigation, discovery documents revealed that JLL

Fund, a major stockholder of Old Hayes that had appointed four of the plaintiff

directors (the "JLL Representatives"), paid the $1.2 million settlement for each of

the JLL Representatives.[80]  JLL Fund made these payments pursuant to contractual

indemnification obligations it owed the JLL Representatives.[81]   Using this

information, Old Hayes argued that the JLL Representatives suffered no injury and

lacked standing to bring their indemnification claim.[82]  On that argument, Old Hayes

moved for summary judgment.[83]   The Court granted summary judgment and

explained its reasoning as follows:

> When a purported indemnitee has all of his indemnifiable
> expenses paid in full and cannot show an out-of-pocket
> loss, he has no claim for indemnification under section
> 145. The relevant provisions of that statute empower a

---

[78]    *Id.* at 214-15.

[79]    *Id.* at 216.

[80]    *Id.* at 216-17.

[81]    *Id.* at 217.

[82]    *Id.* at 217-18.

[83]    *Id.* at 217.

> corporation to provide indemnification of only those amounts "actually . . . incurred by the person . . . ." This language is best understood as a statutory embodiment of the common law of indemnification, which generally recognizes that a party who "'has not and will not sustain any actual out-of-pocket loss' as the result of a claim raised against it has no indemnification claim . . . ." Therefore, under this reading of section 145, once a co-indemnitor fully reimburses its indemnitee for indemnifiable liabilities, the indemnitee lacks standing to assert an indemnification claim against the other indemnitor in the indemnitee's own right.[84]

The Court further held that JLL Fund was the real party-in-interest because it fully satisfied its obligations to its indemnitees.[85] As such, JLL Fund could sue the co-indemnitor on a theory of contribution.[86]

In *Pontone*, the Court held that because the plaintiff, a former officer and director, received advancement from a competitor under a separate indemnification agreement, he lacked standing to pursue advancement for expenses already paid by the competitor.[87] The plaintiff in *Pontone* had resigned from his position as

---

[84] *Id.* at 222-23 (omissions in original) (quoting 8 *Del. C.* §§ 145(a)-(c); *Perno v. For-Med Med. Gp., P.C.*, 673 N.Y.S.2d 849, 851 (Sup. Ct. 1998)).

[85] *Id.* at 224.

[86] *Id.*

[87] 100 A.3d 1023 at 1045.

executive vice president and director of two corporations.[88]  As part of his resignation, he agreed not to compete with or solicit customers from the corporations for three years.[89]  At the end of the three-year period, the plaintiff became a consultant for a competitor corporation.[90]  The corporations brought litigation against the plaintiff challenging the propriety of the plaintiff's consulting agreement with the competitor.[91]

The plaintiff executed a loan agreement with the competitor.[92]  Under that agreement, the competitor agreed to advance the plaintiff's legal fees and expenses in the underlying proceeding and in the advancement proceeding against the corporations.[93]  The terms of the loan agreement required the plaintiff to repay the advanced expenses if he recovered them from the corporations.[94]  The terms also

---

[88]     *Id.* at 1029.

[89]     *Id.*

[90]     *Id.*

[91]     *Id.* at 1030.

[92]     *Id.* at 1032.

[93]     *Id.*

[94]     *Id.* at 1033-34.

forgave all advanced expenses if the plaintiff was unsuccessful in his advancement proceeding against the corporations.[95]

The loan agreement, which the plaintiff and competitor entered into after the commencement of litigation, also referenced the indemnification terms of the consulting agreement, which they entered into before any litigation.[96] The consulting agreement explicitly indemnified the plaintiff against third-party claims, expenses, and costs arising out of the consulting agreement.[97]

The Court agreed with the corporations that the loan and consulting agreements provided rights of mandatory advancement and indemnification from the competitor for expenses incurred in the underlying proceeding.[98] Thus, the plaintiff lacked standing to pursue advancement from the corporation for expenses already paid.[99]

Ecolab argues that the Effectuation Agreement between Creel and the Trusts is similar to the indemnification agreements in *Levy* and *Pontone* and that the

---

[95]     *Id.* at 1034.

[96]     *Id.* at 1029, 1032-34.

[97]     *Id.* at 1033.

[98]     *Id.* at 1037-38.

[99]     *Id.* at 1059.

payment by the Trusts on behalf of Creel under the terms of the Effectuation Agreement is similar to the indemnification and advancement payments made on behalf of the plaintiffs in *Levy* and *Pontone* because (1) the Effectuation Agreement's provisions regarding reimbursement are similar to those of common indemnification agreement and (2) Creel is not actually responsible for her portion of the Settlement.[100]

Creel asserts that the Effectuation Agreement is not an indemnification agreement. First, the indemnification agreements in *Levy* and *Pontone* explicitly and unambiguously provided indemnification rights.[101] By comparison, a cursory review of the language of the Effectuation Agreement reveals no explicit or unambiguous language regarding indemnification.[102] To the contrary, the Effectuation Agreement states the purpose of the agreement is to "complete settlement of the *ITV* Action,"

---

[100]    Def.'s Opening Br. Mot. to Dismiss 19-26.

[101]    *Levy*, 924 A.2d at 216 ("[U]nder the relevant provision of JLL Fund's limited partnership agreement, each of the JLL Representatives enjoyed broad indemnification rights for actions taken on behalf of the partnership."); *Pontone*, 100 A.3d 1023, at 1033.

[102]    *See* Compl. Ex. H.

and the agreement requires that Creel "reimburse the Trusts" upon the successful conclusion of Creel's indemnification claim against Ecolab.[103]

Second, the context in which Creel's counsel and the Trusts' counsel drafted the Effectuation Agreement is very different from the contexts of *Levy* and *Pontone*. For example, in *Pontone*, the indemnification agreement was part of a larger agreement, the consulting agreement.[104] Also, in both *Levy* and *Pontone*, the co-indemnitors entered into the indemnification agreements before the litigation commenced, and the co-indemnitors, thus, had pre-existing obligations to their indemnitees.[105] Here, the Effectuation Agreement is limited in scope to the payment and potential reimbursement of the Settlement, and Creel and the Trusts entered into the agreement to settle the then-extant litigation.[106] The Trusts had no pre-existing obligation to Creel to advance her portion of the Settlement.

---

[103] *Id.* at 1.

[104] *Pontone*, 100 A.3d at 1033.

[105] *Compare id.* at 1029 (consulting agreement dated May 30, 2010), *with id.* at 1032 (advancement proceeding commenced August 26, 2013); *compare Levy*, 924 A.2d at 216-17 (indemnification rights established under limited partnership agreement of JLL Fund), *with id.* at 217 (payment of already-existing indemnification obligations).

[106] *See* Compl. Ex. H, at 1.

Third and finally, counsel for Creel submitted to the Court that they drafted the agreement to ensure that the agreement did not adversely affect Creel's indemnification rights and that the agreement only facilitated settlement of the *ITV* Action when Ecolab shirked its advancement obligation by refusing to advance payment of Creel's portion of the Settlement.[107]

Creel points to *DeLucca v. KKAT Management, L.L.C.*[108] and *Schoon v. Troy Corp.*[109] to respond that she did incur the Settlement expense because the Trusts acted as volunteers and because she is obligated to repay them in the event she is successful in this indemnification action. This line of Delaware cases suggests that this Court will not allow the purported indemnitor to shirk its obligations because of the efforts of a volunteer. In *DeLucca*, the Court refused to allow the company to stall payment when the person owed advancement rights "find[s] an affluent aunt, best friend, or other third party to front her defense costs" because this creates a "perverse incentive" for companies to refuse to provide advancement.[110] Similarly

---

[107]    Oral Arg. Tr. 50:1-11.

[108]    2006 WL 224058 (Del. Ch. Jan. 23, 2006).

[109]    948 A.2d 1157 (Del. Ch. 2008), *superseded on other grounds by statute*, 77 Del. Laws ch. 14, § 3 (2009).

[110]    *DeLucca*, 2006 WL 224058, at *9.

in *Schoon*, which then-Vice Chancellor Lamb decided only ten months after issuing his ruling in *Levy*, the Court echoed the holding of *DeLucca* and refused to provide a "perverse incentive" to companies when a third party "voluntarily under[takes] to [advance] fees and expenses without obligation."[111]

Defendant argues, and I acknowledge, that *DeLucca* and *Schoon* arose in the advancement context.[112] Defendant, however, does not provide any justification why Delaware policy should not prevent a corporation from shirking its indemnification obligation when a third party advances payment without a pre-existing obligation, when that same policy prevents corporations from shirking their advancement obligations.

Thus, while I do not resolve for purposes of this motion whether the Effectuation Agreement is, or is not, an indemnification agreement, I rule that Creel has stated a reasonably conceivable claim that the Effectuation Agreement is not an indemnification agreement, which would make the teachings of *Levy* and *Pontone* inapplicable here. I also do not decide whether the holdings of *DeLucca* and *Schoon*

---

[111]    *Schoon*, 948 A.2d at 1175.

[112]    Def.'s Reply Br. Mot. to Dismiss 16.

apply at this point. I only point out the alternative role the Trusts may have acted in, if they were not co-indemnitors.

## III. ANALYSIS OF CREEL'S MOTION FOR SUMMARY JUDGMENT

Creel seeks summary judgment on all counts of her Complaint. She seeks indemnification for her portion of the Settlement, indemnification for her attorneys' fees at her counsel's standard hourly rates, and fees-on-fees for this action to enforce her indemnification rights.[113] Additionally, Creel seeks pre-judgment interest on these amounts.[114]

In its opposition to Creel's motion, Ecolab argues that Creel is not entitled to indemnification because (1) Creel did not incur her portion of the Settlement, as argued in the Motion to Dismiss, (2) Creel did not obtain the required approval of the Settlement from Ecolab, and (3) the Settlement allocation was not reasonable.[115]

### A. Standard of Review

Summary judgment will be "granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

---

[113]     *See generally* Compl. ¶¶ 101-27.

[114]     *Id.* at 35-36.

[115]     Def.'s Opp'n Br. Mot. Summ. J. 30-52.

judgment as a matter of law."[116]   The movant bears the initial burden of demonstrating that there is no question of material fact.[117]  When the movant carries that burden, the burden shifts to the nonmoving party "to present some specific, admissible evidence that there is a genuine issue of fact for a trial."[118]  When considering a motion for summary judgment, this Court must view the evidence and the inferences drawn from the evidence in the light most favorable to the nonmoving party.[119]  Even so, the nonmoving party may not rely on allegations or denials in the pleadings to create a material factual dispute.[120]

### B.     Indemnification for Creel's Portion of the Settlement

As I explained above,[121] Ecolab's argument that Creel did not incur any loss or expense associated with the Settlement requires this Court to interpret the

---

[116]  *Twin Bridges Ltd. P'ship v. Draper*, 2007 WL 2744609, at *8 (Del. Ch. Sept. 14, 2007) (citing Ct. Ch. R. 56(c)).

[117]  *Deloitte LLP v. Flanagan*, 2009 WL 5200657, at *3 (Del. Ch. Dec. 29, 2009).

[118]  *Id.* (citing *Watson v. Taylor*, 829 A.2d 936 (TABLE), 2003 WL 21810822, at *2 (Del. Aug. 4, 2003)).

[119]  *Judah v. Del. Tr. Co.*, 378 A.2d 624, 632 (Del. 1977); *Fike v. Ruger*, 754 A.2d 254, 260 (Del. Ch. 1999), *aff'd*, 752 A.2d 112 (Del. 2000).

[120]  Ct. Ch. R. 56(e).

[121]  *See* Section II.B above.

Effectuation Agreement and determine whether it is, or is not, an indemnification agreement. Both parties provide objectively reasonable interpretations of the Effectuation Agreement. Ecolab argues that the Effectuation Agreement is an indemnification agreement because it obligated the Trusts to pay Creel's portion of the Settlement and does not obligate Creel to repay the Trusts if she is unsuccessful in her indemnification claim.[122] This interpretation stresses characteristics that are present in traditional indemnification agreements. Creel, on the other hand, asserts that the Effectuation Agreement is not an indemnification agreement because the Trusts had no pre-existing obligation to indemnify Creel and because Creel is required to repay the Trusts if she is successful in this indemnification action; the agreement simply allowed the parties to complete settlement of the *ITV* Action. Creel's interpretation highlights the Trusts' voluntary role.

Faced with two reasonable interpretations, I must examine the intent of the parties when they entered into the agreement. Creel and Ecolab have submitted exhibits to support, or oppose, this motion for summary judgment. None of these exhibits, however, allow me to deduce the intent of Creel and the Trusts when creating the Effectuation Agreement. Without more factual information regarding

---

[122]     Def.'s Opening Br. Mot. to Dismiss 27-28.

the intent of Creel and the Trusts, I cannot appropriately interpret the Effectuation Agreement.[123] I, therefore, deny summary judgment as to indemnification for Creel's portion of the Settlement.

### C. Indemnification for Creel's Attorneys' Fees at Standard Hourly Rates

Ecolab provided Creel with advancement during the *ITV* and *Ahlers* Actions; however, Ecolab demanded a discount on the attorneys' fees of approximately nine percent off the standard 2015 rate, and Ecolab refused to permit any annual rate increases.[124] Ecolab rejected annual rate increases based on its policy with its own outside counsel to hold hourly billing rates level during the pendency of a matter.[125] Ecolab based the discount on Creel's counsel's decision to offer a discount to the directors' and officers' liability insurer that originally paid the fees. Creel's counsel agreed to submit invoices at the discounted rate without annual rate increases but

---

[123] This factual information will illuminate the legal issue surrounding the Effectuation Agreement. *In re Dairy Mart Convenience Stores, Inc. Deriv. Litig.*, 1999 WL 350473, at *11 (Del. Ch. May 24, 1999) ("[T]his Court has the discretion to deny summary judgment if it decides that a more thorough development of the record would clarify the law or its application." (citing *Alexander Indus., Inc. v. Hill*, 211 A.2d 917, 918-19 (Del. 1965); *Ebersole v. Lownegrub*, 180 A.2d 467, 468-69 (Del. 1962))).

[124] Grant Aff. Ex. 26, at DC0000916.

[125] *Id.* at DC0000914.

reserved its right to seek recovery of the higher rates.[126]  Defendant does not dispute these facts.[127]  Creel now seeks indemnification for her counsel's standard hourly rates, without any discount and with annual rate increases, and prejudgment interest on those additional attorneys' fees.

Section 145(a) requires that the indemnitee's attorneys' fees be reasonable.[128] "A party's expenses are reasonable if they were 'actually paid or incurred[,] . . . were . . . thought prudent and appropriate in the good faith professional judgment of competent counsel[,] and were charge[d] . . . at rates, or on a basis, charged to others for the same or comparable services under comparable circumstances.'"[129]

> Advancement is a contractual right governed by the terms of the operative agreement.  When a company has provided a covered person with a mandatory advancement right conditioned only on an undertaking to pay, the company "does not have the right to impose any terms or conditions on . . . advancement other than an undertaking to repay."  . . .  [The company] cannot now build in other obligations.  . . .  [The company] could have built

---

[126]    Grant Aff. Ex. 3, at 35 (Ecolab's response to RFA No. 51).

[127]    *See* Def.'s Opp'n Br. Mot. Summ. J. 53-56.

[128]    8 *Del. C.* § 145(a) (limiting indemnification to "expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred").

[129]    *White v. Curo Tex. Hldgs., LLC*, 2017 WL 1369332, at *5 (Del. Ch. Feb. 21, 2017) (alterations and omissions in original) (quoting *Delphi Easter P'rs Ltd. P'ship v. Spectacular P'rs, Inc.*, 1993 WL 328079, at *9 (Del Ch. Aug. 6, 1993)).

> conditions and limitations into the advancement right . . . .
> What [the company] cannot do now is retrospectively
> revise the advancement right to insert conditions and
> limitation that are not part of the contract.[130]

Ecolab does not assert that Creel's counsel's standard rates for attorneys' fees are unreasonable.[131]    Instead, it argues that when a third party is paying an indemnitee's attorneys' fees, the third party must be allowed to determine the appropriateness of the billing rate.[132]  While parties may agree to such a third-party determination, Delaware law does not mandate it.

The advancement provisions of Ecolab's Charter and Bylaws required Ecolab to pay Creel's attorneys' fees.[133]  These provisions fail to state any conditions on attorneys' fees.[134]  If Ecolab desired to pay the same rates as the policy insurer without any annual increases, then it should have included these conditions in its

---

[130]    *White*, 2017 WL 1369332, at *7-8 (first omission in original) (quoting *Blankenship v. Alpha Appalachia Hldgs., Inc.*, 2015 WL 3408255, at *26 (Del. Ch. May 20, 2015)).

[131]    *See* Def.'s Opp'n Br. Mot. Summ. J. 53-56.

[132]    *Id.* at 55.

[133]    Compl. Ex. D, at 17; *id.* Ex. E art. V, § 3.

[134]    *See* Compl. Ex. D, at 17; *id.* Ex. E art. V, § 3.

Charter, Bylaws, and Indemnification Agreement. It did not, and therefore, it cannot impose these conditions after the fact.[135]

For the foregoing reasons, I grant Creel's Motion for Summary Judgment as to additional attorneys' fees at counsel's standard hourly rates. I also award prejudgment interest for the additional attorneys' fees. Prejudgment interest accrues at the legal rate set forth in 6 *Del. C.* § 2301(a) and is compounded quarterly.[136]

### D.    Fees-on-Fees

Indemnitees may recover expenses incurred in prosecuting an indemnification suit, or fees-on-fees, when they are awarded indemnification.[137] Because the largest amount at issue, Creel's portion of the Settlement, remains unresolved, I reserve judgment at this time.

## IV.    CONCLUSION

For the foregoing reasons, I determine that Plaintiff has stated a reasonably conceivable claim and, therefore, DENY Defendant's Motion to Dismiss. I GRANT

---

[135]    *White*, 2017 WL 1369332, at *8 ("[The Company] also could have built conditions and limitations into the advancement right . . . . What [it] cannot do now is retrospectively revise the advancement right to insert conditions and limitations that are not part of the contract.").

[136]    *Underbrink v. Warrior Energy Servs. Corp.*, 2008 WL 2262316, at *19 (Del. Ch. May 30, 2008).

[137]    *See Stifel Fin. Corp. v. Cochran*, 809 A.2d 555, 561 (Del. 2002).

in part and DENY in part Plaintiff's Motion for Summary Judgment. The nature of the Effectuation Agreement, whether it is, or is not, an indemnification agreement, the question of whether Creel "actually incurred" her portion of the Settlement, and a determination as to Creel's claim for fees-on-fees remain open issues for trial.[138]

**IT IS SO ORDERED**.

Sincerely,

*/s/Tamika Montgomery-Reeves*

Vice Chancellor

TMR/jp

---

[138] I address Ecolab's argument that Creel did not obtain approval of the Settlement in a separate letter opinion issued today. I do not address Ecolab's reasonableness argument as it is contingent on a showing that Creel did not incur her portion of the Settlement.